# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACEY SANCHEZ-LEVINE,<br><br>    Plaintiff,<br><br>  v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, *ET AL.*,<br><br>    Defendants. | Case No. CV 16-3179 DMG (SKx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is before the Court following a half-day bench trial that took place on March 17, 2017. David S. Rankin appeared on behalf of Plaintiff Stacey Sanchez-Levine. Misty A. Murray appeared on behalf of Defendant Metropolitan Life Insurance Company ("MetLife").

Having carefully reviewed and considered the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# I.

# FINDINGS OF FACT[1]

## Sanchez-Levine's Relevant Employment History

1. Sanchez-Levine began working for Dignity Health ("Dignity") as a patient account representative on or around February 11, 2013. Administrative Record ("AR") at 560 [Doc. ## 36-3–36-5]. As part of her occupational duties, Sanchez-Levine was responsible for verifying documentation for timely collection of patient accounts, requesting and collecting medical records, fielding customer phone calls, facilitating medical record requests from patients, and communicating with insurance companies and hospital departments to resolve various issues with customer accounts. AR at 516. Sanchez-Levine was required to continuously sit and engage in keyboard use and repetitive motion, and occasionally to stand, walk, climb, lift from the floor to waist level up to 20 pounds, lift from waist level and above up to 10 pounds, carry objects, push and pull, twist, bend, reach forward and overhead, squat, kneel, crawl, and engage in wrist position deviation and fine motor activities. AR at 517.

2. Sanchez-Levine was enrolled in the employee welfare benefit plan established by her employer (the "Plan"), which is at issue in this action. [Doc. # 36-2].

3. MetLife at all relevant times administered long-term disability ("LTD") benefits provided to Plan participants, including Levine, by issuing group policy number 114178-1-G to Dignity. *See* Plan at 000004. That policy and the Plan pay LTD disability benefits. *See id.* at 38–48. MetLife acted as a claims administrator and as an Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Section 1001 *et seq.*, claims fiduciary of the Plan. *Id.* at 59–63.

4. As of May 30, 2014, Sanchez-Levine's last day of work, she was a participant in, and eligible for benefits under, the Plan. *See* AR at 560.

---

[1] To the extent any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed.

**Relevant Plan Terms**

5. To be entitled to LTD benefits, Plan participants must be "disabled" or suffer a "disability" as defined by the Plan. The relevant Plan terms are as follows:

> Disability or Disabled means that as a result of Sickness or injury You are either Totally Disabled or Partially Disabled.
>
> Totally Disabled or Total Disability means:
>
> During the Elimination Period and the next 24 months, You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way.

Plan at 27.

6. The Plan defines Substantial and Material Acts as:

> the important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue Your Usual Occupation, We will first look at the specific duties required by Your job. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in Your Usual Occupation. If any specific, material duties required of You by Your job differ from the material duties customarily required of other employees engaged in Your Usual Occupation, then We will not consider those duties in determining what substantial and material acts are necessary to pursue Your Usual Occupation.

*Id.* at 28.

7. Under the terms of the Plan, the Elimination Period is 180 days. *Id.* at 21.

8. After the Elimination Period plus 24 months, the definition of disability or disabled under the Plan changes to an "Any Occupation" standard. *Id.* The Plan defines disability during this period as:

| | |
|---|---|
| 1 | You are not able to engage with reasonable continuity in any occupation in |
| 2 | which You could reasonably be expected to perform |
| 3 | satisfactorily in light of Your: |
| 4 | • age; |
| 5 | • education; |
| 6 | • training; |
| 7 | • experience; |
| 8 | • station in life; and |
| 9 | • physical and mental capacity |
| 10 | that exists within any of the following locations: |
| 11 | • a reasonable distance of travel time from Your residence in |
| 12 | light of the commuting practices of Your community; |
| 13 | • a distance of travel time equivalent to the distance or travel time |
| 14 | You traveled to work before becoming disabled; or |
| 15 | • the regional labor market, if You reside or resided prior to |
| 16 | becoming disabled in a metropolitan area. |
| 17 | *Id.* |

### **Sanchez-Levine's LTD Benefits Claim**

9. On December 16, 2014, Sanchez-Levine filed a claim for LTD benefits with MetLife, claiming that she was disabled as of June 2, 2014. AR at 499–500. She claimed that she was unable to perform her job duties due to neck pain, right arm and hand numbness, lower back tightness, dizziness, headache, fatigue, general "pain," as well as stress and anxiety. *Id.* at 499, 509.

10. Sanchez-Levine's treating providers included Dr. Roland Lopez (general physician), Dr. David Johnson (orthopedic surgeon), Dr. Ravi Goklaney (psychiatry), Dr. Calvin Kubo (general physician), Dr. Tod A. Shapiro (orthopedist), Dr. Steven Schopler (orthopedist), and Kristen Calciano (nurse practitioner). *Id.* at 237, 348, 352, 427, 441, 553, 567. Therapist Gregory Yeasley, MA, MFT, also saw Sanchez-Levine. *Id.* at 451.

11. To evaluate Sanchez-Levine's claim, MetLife requested medical records from Sanchez-Levine's treating providers by letters dated January 12, 13, and 28, 2015. *Id.* at 467, 470, 476, 479, 482, 488, 494.

12. Dr. Goklaney saw Sanchez-Levine from April 4, 2014 through August 15, 2014 in connection with her anxiety and depression. *Id.* at 441–51. In a July 24, 2014 note, Dr. Goklaney documented that Sanchez-Levine's symptoms had improved and continued to improve as of August 15, 2014, which was the last date she saw Dr. Goklaney. *Id.* at 447, 449.

13. Therapist Yeasley saw Sanchez-Levine from April 12 through June 28, 2014 in connection with her post-traumatic stress disorder, depression, and anxiety. *Id.* at 451–60. Yeasley's notes indicate that throughout that time she continued to need outpatient treatment and to exhibit symptoms of an emotional disorder that had an adverse effect on or impaired her work performance. *Id.*

14. In a February 2, 2015 Behavioral Health Form, Dr. Goklaney indicated that while Sanchez-Levine was disabled as of June 2, 2014 due to depression and anxiety and related symptoms, her ability to engage in activities of daily living was "intact and unimpaired" as of August 15, 2014. *Id.* at 438. Dr. Goklaney further indicated on that same form that return to work was part of her ongoing assessment and listed a date of August 26, 2014. *Id.* at 439.

15. Sanchez-Levine did not provide MetLife with any records showing that she had treatment with a mental health care provider after August 15, 2014.

16. Sanchez-Levine apparently lost her COBRA health insurance coverage and was unable to see a psychiatrist or therapist again until she obtained subsequent health benefit coverage in December 2014. *See id.* at 403. The AR does not contain any records of a psychiatric or therapy visit in December 2014.

17. On July 29, 2014, Sanchez-Levine saw nurse practitioner Kristen Calciano for an evaluation of her right shoulder pain and neck stiffness. *Id.* at 427–28. Calciano noted that Sanchez-Levine had "mild tenderness" to her posterior neck, experienced pain

with right shoulder range of motion, and complained of numbness in the arm after shoulder movement. *Id.* at 427. Calciano referred Sanchez-Levine to an orthopedic surgeon, and ordered x-rays of her cervical spine and right shoulder. *Id.*

18. Sanchez-Levine returned to Calciano on June 13, 2014 for a lab follow-up. Her medical notes do not indicate any physical limitations but state that Sanchez-Levine was seeing a psychiatrist for bipolar and post-traumatic stress disorders and was under more stress due to a "work issue." *Id.* at 429.

19. Sanchez-Levine first saw Dr. Shapiro on August 7, 2014 for an evaluation of shoulder pain. *See id.* at 354. Dr. Shapiro noted that Sanchez-Levine's shoulder range of motion was "full in elevation, abduction, external rotation[,] and internal rotation," and that her rotator cuff muscle strength was "good." *Id.* at 343. Dr. Shapiro ordered Levine to undergo an MRI of her cervical spine. *Id.*

20. On September 11, 2014, Dr. Shapiro's physician assistant reviewed the MRI results and noted that Sanchez-Levine's reported pain symptoms appeared to be related to her cervical spine, not to her shoulders. *Id.* at 352–53. Dr. Shapiro did not take Sanchez-Levine off work but instead referred her to Dr. Schopler for an evaluation of her cervical spine. *Id.* at 352.

21. On September 22, 2014, Sanchez-Levine met with Dr. Schopler. *Id.* at 348. Sanchez-Levine's exam notes state that the doctor was "inquisitive about superimposed and concomitant carpal tunnel syndrome" as opposed to "cervical radiculopathy," and planned to proceed with testing to rule out one or the other. *Id.* at 350. Dr. Schopler's Physician Assistant noted the following regarding her conversation with Sanchez Levine:

> [Sanchez-Levine] is quite persistent and adamant inquiring if this is an industrially related injury and condition. I specifically asked her on multiple occasions if there was a specific industrial injury that caused her complaints. Her answer every time was no. I instructed her and informed her that while she does computer job details, that all of her radiographic changes ~~were~~ chronic and progressive in nature, not acute in nature. She also inquires

about permanent disability repetitively. I informed her that Dr. Schopler does not take individuals off work unless we have operated on them. She inquires about how disability will be continued. I reassured her that she needs to go back to her psychiatrist as that was the individual who initially has had her off [of work] for other medical reasons. She has no neurologic deficit at this time to warrant her to not be able to perform a desk job.

*Id.* at 350–51.

22. On October 17, 2014, Sanchez-Levine underwent an electromyogram and ("EMG") ordered by Dr. Schopler, which was normal and found "no evidence of acute or chronic cervical radiculopathy" and "no evidence of carpal tunnel syndrome." *Id.* at 345–46.

23. Dr. Lopez completed a form dated December 22, 2014 that stated Sanchez-Levine was temporarily totally disabled for three months as of November 10, 2014 due to diagnoses of carpel tunnel syndrome ("CTS"), anxiety, and insomnia. *Id.* at 497–98. This form was submitted to MetLife, but no medical records were provided with this form. *Id.*

24. On January 26, 2015, Sanchez Levine first treated with Dr. Johnson for an orthopedic evaluation. *See id.* at 237–51 (full report). The Doctor's treatment notes state that she was considered temporarily totally disabled from January 26, 2015 through February 25, 2015, that she had not "yet achieved maximum medical improvement," "is in need of further care," and "there [were] no conditions that w[ould] impede or delay [her] recovery." *Id.* at 250.

25. Dr. Johnson again saw Sanchez-Levine on February 25, 2015 and extended her temporary disability through March 26, 2015. *Id.* at 264.

26. Dr. Johnson completed and signed an undated MetLife form, which itself appears to have been faxed on March 9, 2015, providing that Sanchez-Levine could perform 0 hours of any physical activity due to CTS and unspecified decreased range of motion. *Id.* at 415–18. The form provides that as of its completion Dr. Johnson most

recently evaluated Sanchez-Levine on February 25, 2015. *Id.* at 416. In response to the question of whether the doctor had advised the patient about a return to work date, Dr. Johnson checked the box marked "No" and wrote what appears to be "Program guarded" in the space for explanation. *Id.* at 418.

27. In sum, Dr. Goklaney indicated that Sanchez-Levine was disabled from June 2 through August 26, 2014 due to her psychological issues; Dr. Lopez indicated that she was disabled from November 10, 2014 through February 10, 2015 due to physical and psychological conditions; and Dr. Johnson indicated she was disabled from January 26, 2015 through March 26, 2015 due to physical ailments.

28. MetLife's Psychiatric Clinical Consultant and Nurse Consultant reviewed Sanchez-Levine's records and attempted to speak with Dr. Choi[2] and Dr. Johnson. *Id.* at 593–94, 596–601, 616, 625–29, 636, 644–55.

29. MetLife's claims specialist and clinical consultant also interviewed Sanchez-Levine regarding her claim. *Id.* at 570–72 (January 13, 2015 interview with Sanchez-Levine in which MetLife advises her of necessary information), 603–08 (February 11, 2015 interview with Sanchez-Levine in which MetLife tells her who makes claim decision and ensured Sanchez-Levine had necessary contact information; notes indicate Sanchez-Levine had no further questions), 633–34 (MetLife phoned Sanchez-Levine on February 23, 2015 to follow up on claim, notified her that MetLife had requested records from Dr. Johnson but not received them), 635–36 (February 23, 2015 call in which MetLife explains records that are needed, that current medical records only support a disability through August 2014, and Sanchez-Levine said she understood), 641–42 (MetLife contacts Sanchez-Levine on February 27, 2015 to get further records), 656

---

[2] Dr. Choi appears to be a treatment provider that saw Sanchez-Levine in, at least, February 2015, but the Court could not locate records from that visit in the AR. *See* AR at 201. Rather, Dr. Sugarman, an independent physician consultant who later reviewed Sanchez-Levine's records during her claims appeal, reviewed Dr. Choi's notes. *Id.* Dr. Choi's specialization is not clear from the AR or Dr. Sugarman's review.

(MetLife contacted Sanchez-Levine on March 16, 2015 to update her on final review of claim and answered her questions).

30. Based upon its review, MetLife determined that there was insufficient medical evidence to support a finding that Sanchez-Levine was unable to perform her job duties. *Id.* at 625–29, 648–55, 661–65.

31. MetLife advised Sanchez-Levine of its decision by letter dated March 19, 2015. *Id.* at 401–06.[3] In that letter, MetLife set forth its evaluation of the medical evidence and conclusions in detail, including a review of the medical records received and notification of records not received. *Id.* at 403–05. MetLife ultimately concluded that "[t]he submitted medical documentation does not support that [Sanchez-Levine] ha[s] ongoing psychiatric functional limitations from [her] disability date of June 2, 2014, throughout [her] entire 180 day Elimination Period and continuing past [her] benefit start date of November 29, 2014," and that there was insufficient medical documentation "to support [that] [she] [is] unable to return to work due to any physical diagnoses" over the same time period. *Id.* at 403–04. The letter also advised Sanchez-Levine of her appeal rights under the Plan. *See id.* at 405–06.

### **Sanchez-Levine's Appeal of LTD Benefits Claim Denial**

32. Sanchez-Levine appealed MetLife's determination by letter dated March 24, 2015, stating that Dr. Johnson had not given her a return to work date. *Id.* at 358.

33. With her appeal, Sanchez-Levine submitted additional medical records from Dr. Shapiro; Dr. Matthew Maibaum, PhD (psychologist); and Dr. Johnson, as well as physical therapy records. *Id.* at 214–26, 252–332, 340–400.

34. On January 9, 2015, as part of her worker's compensation claim, Dr. Maibaum examined Sanchez-Levine and performed an independent "Complex Comprehensive Psychosocial Consultation" to determine whether her psychosocial

---

[3] An original denial letter, dated March 17, 2015, was also sent to Sanchez-Levine. AR at 407–12. The March 19 letter was an "amended" denial letter. *Id.* at 401.

symptoms were industrial or non-industrial. *Id.* at 304–05. Dr. Maibaum conducted an 11-part psychosocial test battery and authored a comprehensive report. *See id.* at 304–32.

35. The report noted that the "psychological testing results provided the best support to the symptoms the patient was reporting, as they were consistent with her overall presentation" and that "the bipolar problems present seems to be 'industrial' to the degree that actual events of the workplace injury period exacerbated or aggravated mood swings as such and destabilized the mood stability she showed prior to taking subject job." *Id.* at 317, 328. Dr. Maibaum was of the clinical opinion that Sanchez-Levine "developed disabling psychosocial distress from work and that is and was different from the prior 'mental and emotional' difficulties which are under control and did not keep [her] from working." *Id.* at 330. His notes on her mental disorder diagnoses states that "the [bipolar disorder] diagnosis should be added to her diagnoses picture, if true, as a pre-existing condition 'under control and not work disabling.'" *Id.* at 327. The report did not offer an opinion on Sanchez-Levine's return to work status. *Id.*

36. The additional records from Dr. Schopler reflect the above-recited information related to her September and October 2014 visits. *Id.* at 340–51.

37. Dr. Johnson completed a Primary Treating Physician's Progress Report for the State of California Division of Workers' Compensation, dated March 25, 2015, which indicated that Sanchez-Levine should remain off work from that date through April 25, 2015. *Id.* at 297; *see id.* at 257–97 (full report).

38. On April 22, 2015, Dr. Johnson completed and signed a Doctor's Certification of Disability to permit Sanchez-Levine to obtain a six-month temporary disabled person placard from the California Department of Motor Vehicles, which provided that she suffered a "significant limitation in the use of lower extremities due to lumbar spine radiculopathy." *Id.* at 255.

39. A work status report Dr. Johnson completed and signed that same day provides in the comments section "sedentary work with the ability to sit and stand at

will" and that Sanchez-Levine was deemed totally temporarily disabled because her "employer has been unable to accommodate [her] work restrictions." *Id.* at 253.

40. With the supplemental records from Dr. Johnson, Sanchez-Levine's treating physicians considered her disabled intermittently from June 2, 2014 through April 25, 2015.

41. MetLife spoke to Sanchez-Levine several times in April and May 2015 regarding her appeal and the additional information needed to perfect her appeal. *Id.* at 672 (MetLife on March 23, 2015 discussed with Sanchez-Levine denial of her claim, and she stated she understood), 677–79 (April 2 and April 16, 2015 conversations wherein MetLife tells Sanchez-Levine what is needed), 681–82 (April 22, 2015 conversation where MetLife tells Sanchez-Levine to send certain documentation), 694–97 (April 30, 2015 discussion of treating physicians, MetLife tells Sanchez-Levine to submit physical therapy notes), 721–23 (May 4 and 5, 2015 phone calls in which MetLife advised Sanchez-Levine how to submit physical therapy notes and confirmed receipt of those notes). MetLife also updated Sanchez-Levine by mail as to the status of her appeal, and indicated what records were still needed, as well as what was requested from her physicians and by what deadline so that she could confer with them independently. *Id.* at 153, 233.

42. MetLife's Psychiatric Clinical Consultant and Nurse Consultant reviewed all of the medical records and opined that the records did not support functional impairment for the entire 180-day elimination period. *Id.* at 697–706, 708–21.

43. MetLife referred the medical records to two independent physician consultants for review, including Peter Sugarman, M.D. (Board Certified in Adult Psychiatry) and Dennis Gordan, M.D. (Board Certified in Physical Medicine and Rehabilitation and Internal Medicine). *See id.* at 202, 187, 725–26, 727–28.

44. Dr. Sugarman reviewed 341 pages of medical files and a diary and prepared a review dated May 13, 2015. *Id.* at 195–202. He attempted to speak with Dr. Goklaney, Dr. Choi, and Dr. Maibaum, but they did not return his calls. *Id.* at 198.

-11-

45. In response to the question of whether "the medical information support[s] functional limitations due to a psychiatric condition or combination of psychiatric conditions as of [June 2, 2014]," Dr. Sugarman stated that "[f]rom a psychiatric perspective, functional limitations beyond [June 2, 2014] are not supported by the medical evidence." *Id.* at 199. He provided the following explanation:

> Although the medical information in the record acknowledges the presence of mental health issues as of 6/2/14, the problems are described as chronic and ongoing, rather than acute and severe enough to associate impairment.
>
> More specifically, an evaluation by Dr. Goklaney on 4/4/14 identified chronic depression, chronic panic attacks, and chronic anxiety 'for years.' The evaluation alleges a psychiatric diagnosis of Bipolar II Disorder since 2006 and comorbid trauma issues. While there are some objective signs (appears glum, downcast and blunted) and some possible association with function issues (social isolation, marginal work performance, reduced self-care), the notes do not indicate that her conditions had specifically intensified around that time, such as more intense and severe symptoms, more severe objective signs of illness or a decline in global functioning associated with mental illness. Instead, the record suggests that she experienced work-related stress. She had been accused of a HIPAA violation. This notion is supported by documentation that the claimant's psychiatric symptoms improved when she stopped working. For example, on 6/26/14, Dr. Goklaney indicated that symptoms became less frequent and less intense. This trend is documented over the next several notes.
>
> This reviewer considered the psychosocial consultation by Matthew Maibaum, PhD, performed on 1/9/15. This evaluation appeared to serve a purpose other than disability, but the information is useful nonetheless. Dr. Mailbaum [sic] specified that the claimant alleged work related pain to

several distinct anatomical areas, work mistreatment by supervisors and coworkers, and discrimination at work due to religion. The evaluation commented on the claimant's allegation that work experiences caused impairing distress. Several tests were administered by the psychologist, including an MMPI. The MMPI showed 'considerable magnification of symptoms.' The psychologist concluded that she suffers from poor coping with pain rather than a severe psychiatric condition and suggests that it is possible that workplace issues can aggravate underlying psychiatric problems. This evaluation does not argue for a severe and impairing psychiatric condition, as opposed to the effects of work stress, conflicts related to work, and alleged pain experiences.

To be complete, additional psychiatric information from earlier this year, though not proximate to the date in question, tends not to argue for an impairing psychiatric condition. Dr. Goklamey [sic] indicated that he cleared the claimant to return to work as of 8/26/14. Bung Joo Choie [sic] wrote on 2/24/15 that the claimant suffers from an adjustment disorder and that she feels better.

Overall, the psychiatric portion of the record does not document the presence of a severe and incapacitating psychiatric condition in the context of work stress and physical complaints. A determination of psychiatric incapacity would include a more detailed description of severe clinically relevant psychiatric symptoms, a more objective assessment of the employee's condition that would be consistent with the clinical information, and an indication of global functional difficulties associated with the psychiatric condition.

*Id.* at 200–02.

46. Dr. Sugarman also opined that there was no evidence of adverse medication side effects, and noted instead that the medications generally may have helped rather than impaired Sanchez-Levine. *Id.* at 202.

47. After his initial review, Dr. Sugarman was able to speak with Dr. Maibaum and, in a supplemental report dated May 27, 2015, stated that his prior opinion remained unchanged. *Id.* at 77–79. Dr. Sugarman also indicated that when he related his opinion to Dr. Maibaum that "Dr. Mailbaum [sic] did not disagree" and "made it clear that he only saw [Sanchez-Levine] once and that his opinions are based on a singular evaluation." *Id.* at 77.

48. Dr. Gordan also reviewed Sanchez-Levine's medical records and spoke with Dr. Johnson, Ms. Calciano, and Dr. Shapiro, and prepared a report dated May 22, 2015. *Id.* at 167–80. In response to the question of whether "the medical information support[s] functional limitations due to a psychiatric condition or combination of psychiatric conditions as of [June 2, 2014]," Dr. Gordan stated that "there is only definite support for the restrictions and limitations listed here for the period from [January 30, 2015] until [April 25, 2015]." *Id.* at 172–73. More specifically, Dr. Gordan indicated the following:

> The claimant had a number of complaints, but it does not appear that any of her treating physicians felt she was unable to do a desk job until she was seen by Dr. Johnson on 1/30/15. Dr. Johnson did not feel he could make any comments about the period before he saw her. The claimant had been taken off work by Dr. Shapiro, but that was at her request, and would only have been until the MRI had ruled out some type of dangerous process in the neck.[4] Even so, the only rationale for taking her off work would be if her work were more dangerous than every day nonemployment activities, and

---

[4] There are no medical records in the AR that show Dr. Shapiro took Sanchez-Levine off of work. Rather, the September 2014 medical notes reflect that she was on leave from work at the time of her evaluations with him. *See* AR at 352.

-14-

> that is not the case. It appears that Dr. Johnson also took the claimant off work [total temporary disability] until he could rule out a dangerous situation. Although I did not discuss the end date with him, it appears that this would have been 4/25/15 according to the progress report . . . . The MRIs demonstrated multiple lumbar disc herniations, and Dr. Johnson felt that the claimant had radiculopathy, but the imaging showed no nerve compression and only the left L5 exiting nerve root was contacted by disc material, although he found some decreased sensation on physical exam in bilateral L4 and L5 dermatomes [along with globally decreased strength from pain]. Both shoulders had MRI evidence of rotator cuff tears. The cervical MRI had findings correlating with the decreased sensation in the C6 dermatomes bilaterally, raising the possibility of radiculopathy, for which electrodiagnostic testing has been requested. Dr. Johnson has now indicated in our telephone conversation that the claimant would have limitations of lifting no more than 15 pounds; should not do more than occasional bending, twisting, stooping, *i.e.*, up to 1.5 hours per day and 20 minutes at a time; should not do over shoulder level work because of her rotator cuff problems. I would add that the claimant should not have to hold her head in one position for prolonged periods or assume extreme positions of the head and neck. The cervical spine findings appear to represent progression relative to the 8/26/14 study, and there was no earlier MRI of the lumbar spine or the shoulders.

*Id.* (first and third alteration in original).

49. Dr. Gordan also stated that there was "no evidence" of adverse side effects from medications prescribed. *Id.* at 173.

50. MetLife sent the reports of Dr. Sugarman and Dr. Gordan to Sanchez-Levine's treating physicians for their review and comment. *E.g.*, *id.* at 158. Dr. Kubo

responded only to note that Sanchez-Levine's Hepatitis C was negative. *See id.* at 112–25 (Dr. Kubo's responses at 114, 119). None of the other treating physicians responded.

51. By letter dated June 10, 2015, MetLife upheld its prior determination based upon the reports of Dr. Sugarman and Dr. Gordan as well as the other medical and vocational evidence in the record. *Id.* at 53–60.

## II.

## CONCLUSIONS OF LAW

1. The Plan is an employee welfare benefit plan governed by ERISA, which provides the exclusive remedy for Sanchez-Levine's claims. *See* 29 U.S.C. § 1132(a)(1)(B).

2. The standard of review is *de novo*. Under this standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits," and "evaluate[s] the persuasiveness of conflicting testimony and decide which is more likely true." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.1999) (*en banc*). Further, this Court makes that determination based on the evidence in the administrative record before MetLife at the time the claim determination was made. *See Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 632 n. 4 (9th Cir. 2009); *Kearney*, 175 F.3d at 1090; [Doc. # 35 (denying Sanchez-Levine's motion to augment the AR)].

4. Sanchez-Levine bears the burden of proving her entitlement to benefits under the Plan by a preponderance of the evidence. *See Muniz v. Amec Constr. Mgmt.*, 623 F.3d 1290, 1294 (9th Cir. 2010) (burden on claimant); *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) (evidentiary standard).

5. Sanchez-Levine failed to prove by a preponderance of the evidence that as of June 2, 2014 (the date of claimed disability onset) through November 28, 2014 (the

Plan's Elimination Period) and the next 24 months, she was "disabled" as defined by the Plan—*i.e.*, that due to a sickness or injury she was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue [her] Usual Occupation in the usual and customary way." Plan at 27.

6. That Sanchez-Levine may have suffered from one or several medical conditions does not mean that she was disabled as defined by the Plan. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability. . . . Sometimes [people's] medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions."), *overruled on other grounds as stated in Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1137 (9th Cir. 2017); *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. A claimant bears the burden of proving that an impairment is disabling.").

7. Additionally, a claimant's subjective reports of pain do not establish disability under an ERISA plan. *See Seleine v. Flour Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009), *aff'd*, 409 F. App'x 99, 101 (9th Cir. 2010) ("Seleine's subjective complaints of pain . . . were subject to verification by objective medical evidence. [The administrator] was under no obligation to accept them at face value."); *Bratton v. Metropolitan Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006) ("A finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper [the insurance company] from exercising its fiduciary role of scrutinizing requests for benefits."). Indeed, medical records that document a patient's subjective complaints cannot be "elevate[d] . . . to the status of 'findings'" by the treating physician. *Seleine*, 598 F. Supp. 2d at 1102. Instead, the court

should look to the objective medical evidence in the record to determine whether there is evidence of a disability as defined by the plan at issue. *See id.*

8. Nor does ERISA require plan administrators to accord special deference to the opinions of treating physicians. *See Black & Decker v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physican; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). In fact, "[t]reating physicians are more or less required to accept their patients' representations," yet neither an ERISA claim administrator nor the reviewing court is obligated to do so. *Seleine*, 598 F. Supp. 2d at 1102; *see also Shaw*, 144 F. Supp. 3d at 1128 ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004))). Given that Sanchez-Levine's medical records show that her relationship with her treating physicians was of a "short duration," "[t]he assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense." *Black & Decker*, 538 U.S. at 832.

9. MetLife properly relied on Dr. Sugarman's and Dr. Gordan's reviews to support the conclusion that Sanchez-Levine was not disabled within the meaning of the Plan because those reports are thorough and well supported. *See, e.g.*, *Shaw*, 144 F. Supp. 3d at 1130 ("[A] paper review by a physician retained by the plan administrator may be more reliable than the opinion of a treating physician."); *Broyles v. A.U.L. Corp. Long-Term Disability Ins. Plan*, No. C-07-5305 MMC, 2009 WL 3817935, *6 (N.D. Cal. 2009) ("[C]onsulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination.").

10. Even if this Court credited only Sanchez-Levine's treating physicians, Sanchez-Levine still failed to establish that she was totally disabled under the Plan. Her treating physicians, cumulatively, deemed her disabled from June 2, 2014 through August 26, 2014 and November 10, 2014 through April 25, 2015. This does not prove that she was continuously unable to perform her job duties from June 2, 2014 through November 28, 2016—the disability standard under the Plan. *See* Plan at 27.

11. Further, Dr. Johnson's report that, as of February 2015, Sanchez-Levine could not sit, stand, walk, climb, twist, bend, stoop, reach above her shoulder level or laterally, perform fine finger movements or hand–eye movements, or lift, carry, push, or pull does not change this conclusion because that report, submitted in March 2015, is contradicted by a later report in which Dr. Johnson stated that Sanchez-Levine, as of April 22, 2015, could perform mixed sedentary and standing work. *Compare* AR at 417, *with id.* at 253; *see Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2011) (employee who is unable to sit for more than half of the workday leads to commonsense conclusion that the employee cannot perform job that requires mostly sedentary work).

12. Sanchez-Levine's assertion that MetLife did not engage in a "meaningful dialogue" with her fails. As laid out above, the AR is rife with notes of MetLife representatives' discussions with Sanchez-Levine as to the information she needed to provide during the original and appellate claims process. This is therefore not a case where the administrator "say[s] merely 'we are not persuaded' or 'your evidence is insufficient'" without explaining "in plain language what additional evidence [is] needed and what questions . . . need[] answered in time so that the additional material could be provided," or where the administrator provides only "meaningless medical mumbo jumbo." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011).

13. In sum, MetLife's denial of benefits and affirmance of its denial was proper. Sanchez-Levine is not entitled to LTD benefits under the Plan.

## III.
## CONCLUSION

In light of the foregoing, the Court finds in favor of Defendant and against Plaintiff. The Court concludes that Plaintiff has failed to show by a preponderance of the evidence that she was totally disabled under the ERISA long-term disability benefits Plan. The Court will enter Judgment accordingly.

DATED: September 26, 2017

                                            DOLLY M. GEE
                                UNITED STATES DISTRICT JUDGE